UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
ROBERT ZUNESKA,

                        Plaintiff,

        -against-                              <u>MEMORANDUM & ORDER</u>
                                              16-CV-0620(JS)(ARL)
THE COUNTY OF SUFFOLK, PARENTS
FOR MEGAN'S LAW and THE CRIME
VICTIMS CENTER, and JOHN DOES 1-10,

                        Defendants.
----------------------------------------X
APPEARANCES
For Plaintiff:          Vesselin V. Mitev, Esq.
                        Ray, Mitev & Associates
                        122 North County Road
                        P.O. Box 5440
                        Miller Place, NY 11764

For Defendants:
The County of Suffolk   Marlene L. Budd, Esq.
                        Elaine M. Barraga, Esq.
                        Suffolk County Attorney's Office
                        100 Veterans Memorial Highway
                        P.O. Box 6100
                        Hauppauge, NY 11788

Parents for Megan's
Law and The Crime
Victims Center          Michael A. Miranda, Esq.
                        Richard B. Epstein, Esq.
                        Miranda Sambursky Slone Sklarin
                          Verveniotis LLP
                        240 Mineola Boulevard
                        Mineola, NY 11501


SEYBERT, District Judge:

        Pending before the Court are defendant the County of

Suffolk's (the "County") motion for partial summary judgment and

defendant Parents for Megan's Law's[1] ("PFML," and together with the County, "Defendants") motion for summary judgment seeking dismissal of plaintiff Robert Zuneska's ("Plaintiff") claims. (Cty.'s Mot., Docket Entry 34; PFML's Mot., Docket Entry 35.)  For the following reasons, PFML's motion is GRANTED and the County's motion is GRANTED IN PART and DENIED IN PART.

BACKGROUND[2]

I.  Factual History

    A.  SORA and Plaintiff's Sex Offender Status

        Under New York State's Sex Offender Registration Act, N.Y. Correction Law §§ 168 et seq. ("SORA"), sex offenders must register with the New York State Division of Criminal Justice

---

[1] The Crime Victims Center operates under the name Parents for Megan's Law.  (Ahearn Dep., Miranda Decl. Ex. D., Docket Entry 36-4, 7:17-22.)

[2] The following facts are taken from the County's Local Civil Rule 56.1 Statement, (Cty.'s 56.1 Stmt., Docket Entry 22-1); PFML's 56.1 Statement, (PFML's 56.1 Stmt., Docket Entry 22-3); Plaintiff's Response to the County's 56.1 Statement, (Pl.'s Cty. Resp., Docket Entry 22-2, at 1-12); Plaintiff's Response to PFML's 56.1 Statement, (Pl.'s PFML Resp., Docket Entry 22-4); Plaintiff's 56.1 Counterstatement, (Pl.'s 56.1 Counterstmt., Docket Entry 22-2 at 12-15); and this Court's May 1, 2018 summary judgment order in Jones v. Cty. of Suffolk ("Jones II"), No. 15-CV-0111, 2018 WL 2023477 (E.D.N.Y. May 1, 2018), appeal filed, 2d Cir. Case No. 18-1602.  Because Plaintiff entered an additional paragraph into his Response to the County's 56.1 Statement, the paragraph numbers in his Response do not correspond to the paragraph numbers in the County's 56.1 Statement beginning at paragraph 22.  Any relevant factual disputes are noted.  Internal quotation marks and citations have been omitted.

Services (the "Division").  Jones II, 2018 WL 2023477, at *1 (citing N.Y. Correction Law § 168-a(5), 168-f(1)).  Sex offenders are classified pursuant to SORA as level one ("Level One Offenders"), level two ("Level Two Offenders"), or level three offenders ("Level Three Offenders").  Id. (citing N.Y. Correction Law § 168-l(6)).  "For as long as the offender is required to register, he or she is required to report his or her address to the Division on an annual basis, and for Level One and Level Two Offenders, to appear at a local law enforcement agency and provide a current photograph every three years."  Id. (citing N.Y. Correction Law § 168-f).  While Level One Offenders remain on the registry for twenty years, Level Two and Level Three Offenders remain on the registry for life.  Id.

On December 7, 1998, Plaintiff pled guilty to Rape in the Third Degree.  (Cty.'s 56.1 Stmt. ¶ 11.)  In connection with his conviction, Plaintiff was classified as a Level One Offender under SORA, and as a result, he is required to report his residence to the Division on an annual basis and personally appear to be photographed at his local police precinct every three years.  (PFML's 56.1 Stmt. ¶¶ 67-69); see N.Y. Correction Law § 168-f(2)(b-3).  Plaintiff is required to remain on the sex offender registry until February 23, 2019.  (Cty.'s 56.1 Stmt. ¶ 28.)

B.  Section 1122-12, the HSOA, and the CPA

On February 6, 2007, by Resolution 52-2007, the County adopted Article IV of Suffolk County Code Chapter 1122, and on May 15, 2007, by Resolution 466-2007, it amended and added to that Article.  See Suffolk County Code Art. IV, available at https://ecode360.com/15135035.  In relevant part, Article IV of Chapter 1122 authorizes the Suffolk County Sheriff, in areas outside the Suffolk County Police District, to use deputy sheriffs to conduct initial address verifications of registered sex offenders and perform "random spot-checks of these addresses to ensure that registered sex offenders are residing at the address they have provided."  Suffolk County Code § 1122-11.  Under Suffolk County Code § 1122-12 ("Section 1122-12"), however, the Suffolk County Sheriff is not to perform verifications and spot-checks in towns and villages that have requested, in writing, that the Sheriff not perform these duties.

On December 7, 2010, the County passed the Homeless Sex Offender Act, Local Law 3-2011, Suffolk County Code Chapter 745, Article V (the "HSOA").  (Cty.'s 56.1 Stmt. ¶ 29; HSOA, Budd Decl. Ex. G, Docket Entry 34-8.)  The HSOA requires a "homeless sex offender"--"[a]ny natural person required to register as a sex offender pursuant to [SORA] who has so registered, and who does not have a permanent residence on file," (Suffolk County Code § 745-23)--who is present in the County to "report his or her

4

overnight location to the Suffolk County Police Department
[("SCPD")] by 11:59 p.m. each day," (Cty.'s 56.1 Stmt. ¶ 29;
Suffolk County Code § 745-24). "Any person who violates [the HSOA]
once shall be guilty of a misdemeanor punishable by a fine of up
to $1,000 and/or up to one year's imprisonment." (Suffolk Cty.
Code § 745-26.)

On February 5, 2013, the HSOA was modified by the
County's passage of the Community Protection Act, Local Law 10-
2013, Suffolk County Code Chapter 745, Article VII (the "CPA").
(Cty.'s 56.1 Stmt. ¶¶ 30, 34; CPA, available at
https://ecode360.com/27250164.) Under the CPA, a registered sex
offender seeking emergency housing is required to report "his or
her overnight location within one hour of checking in, registering,
being placed, etc., in an emergency shelter or by 11:59 p.m. each
day, whichever is earlier, to the SCPD." (Cty.'s 56.1 Stmt. ¶ 30;
Suffolk County Code § 745-35(C).) "Any person who fails to report
his or her overnight locations as required by the [CPA] shall be
guilty of a misdemeanor punishable by a fine of up to $1,000 and/or
up to one year in jail." (Suffolk Cty. Code § 745-37.)

It is undisputed that from the time Plaintiff's sex
offender registration period began in 1999, he was never homeless,
he always reported his home address to the Division, and he was
never found to have violated the check-in requirements of the HSOA

or the CPA.  (Cty.'s 56.1 Stmt. ¶¶ 31-32; see Pl.'s Cty. Resp. ¶ 33.)

In addition to modifying the HSOA, the CPA authorized SCPD to contract with PFML to conduct address verifications of registered sex offenders.  (PFML's 56.1 Stmt. ¶ 2.)  PFML is a not-for-profit organization that seeks to prevent and treat child sexual abuse and to provide services for victims of violent crime, and Laura Ahearn served as its Executive Director during the relevant time.  (PFML's 56.1 Stmt. ¶ 1; Ahearn Dep. 7:17-8:2.) Pursuant to the CPA, the County--acting through SCPD--entered into a contract with PFML, effective May 1, 2013 through April 30, 2016 (the "Contract").  (PFML's 56.1 Stmt. ¶ 5; Contract, Miranda Decl. Ex. F, Docket Entry 36-6.)  Under the relevant terms of the Contract, PFML agreed to verify the addresses of registered sex offenders.  (Contract § III.)

C.    The Contract and the Letter

The Contract required PFML to use Registry Verification Field Representatives ("RVR" or "RVRs") "to conduct in-person Home Address Verifications for Level One, Level Two and Level Three Sex Offenders required to report pursuant to SORA, excluding Homeless Sex Offenders and persons currently incarcerated . . . ." (Contract §§ I.E, III.A.2.)  Under the Contract, RVRs were retired law enforcement officers employed by PFML "whose principal duties include[d] in-person or other means of verification of Sex Offender

home or work addresses." (Contract § I.E.) When conducting in-person home address verifications, RVRs were required to use unmarked vehicles and display photographic identification that did "not resemble law enforcement identification." (Contract §§ III.A.2, III.A.3.) RVRs were to verify the home addresses of Level One Offenders, like Plaintiff, once per year. (Contract § III.A.5; PFML's 56.1 Stmt. ¶ 67.)

Ahearn testified that PFML's role under the Contract was to ensure that the sex offender registry was up to date. (Ahearn Dep. 70:15-71:9.) According to Ahearn, when RVRs were unable to verify information on the registry because a certain sex offender was not home, or the address was a vacant lot or an abandoned house, RVRs would notify law enforcement. (Ahearn Dep. 59:11-22.) Similarly, she testified that some registrants did not wish to cooperate with the RVRs, and if they did not cooperate, PFML would inform SCPD that they could not verify the offender's information. (Ahearn Dep. 67:17-68:8; see also Ahearn Dep. 71:5-9 ("So, for us, the goal was to ensure that the registry is up to date. So if an individual . . . chose to not participate or not cooperate, that was up to them and we would have to let law enforcement know, because we couldn't verify them.").) Ahearn testified that RVRs' notifications to SCPD might be in the form of a Sex Offender Registration Tip, which informed SCPD "that there might be an inconsistency in the registry." (Ahearn Dep. 59:20-60:9.) She

continued that after providing the tip, SCPD would decide whether to investigate the sex offender's compliance with registration requirements. (Ahearn Dep. 59:22-61:9.)

Detective Lieutenant Steven Hernandez of SCPD ("Detective Hernandez"), who was responsible for implementing the CPA, testified that he could not compel offenders to comply with RVRs because RVRs were not law enforcement officers. (PFML's 56.1 Stmt. ¶ 40; Pl.'s PFML Resp. ¶ 40; Hernandez Dep., Budd Decl. Ex. K, Docket Entry 34-12, 31:6-23.) Further, he testified that if offenders asked SCPD if they had to cooperate with RVRs, SCPD detectives would tell the offenders that they were not required to do so. (Hernandez Dep. 54:2-14.)

Ahearn testified that shortly after the RVR program was implemented, a sex offender threatened to "slit the throats of the RVRs." (Ahearn Dep. 82:15-23.) She testified that, in an effort to avoid harm to PFML staff, she reached out to the County to send a letter to announce that SCPD was collaborating with PFML. (See Ahearn Dep. 81:25-83:14.) As a result, in July 2013, (Pl.'s Dep., Miranda Decl. Ex. C, Docket Entry 36-3, 67:14-68:6), Detective Hernandez sent a letter to notify offenders of the Contract between SCPD and PFML (the "Letter"), (PFML's 56.1 Stmt. ¶ 56; Letter, Miranda Decl. Ex. G, Docket Entry 36-7; see also Pl.'s PFML Resp. ¶ 57; Hernandez Dep. 63:7-13 (agreeing that threats to PFML agents were a "partial[ ] impetus" for the Letter)). The Letter provides:

Recently, the [SCPD] and [PFML] entered
into a contract for the purpose of conducting
verifications of registered sex offenders[']
residential and employment addresses.
Registered sex offenders are required to
provide this information under [SORA], also
known as Megan's Law (New York State
Correction Law Article 6c).

In the coming days and weeks,
representatives of [PFML] will be visiting all
registrants within the Suffolk County Police
District. The purpose of this visit will be
to conduct in person residence verifications.
The representatives from [PFML] will display
photographic identification which will
identify them as a member of the [PFML]
Organization. You will be asked to provide
them with personal identification of a
verifiable source (e.g. a NY State Driver's
License or NY State Identification Card) or
other accepted forms of documentation that
provides current address information.

In addition, you may be requested to
provide your employment information to the
representative. If such a request is made,
you will be asked to provide documentation
(e.g. work identification card) to the
representative for verification purposes. If
proper documentation is presented this process
should take only several minutes to complete.

(Letter.) Plaintiff highlights Detective Hernandez's testimony

that to encourage cooperation, the Letter did not inform offenders

that they were not obligated to comply with PFML representatives.

(Pl.'s 56.1 Counterstmt. ¶ 7.)

D.   Verifications of Plaintiff

Plaintiff testified that from 2007 to 2012--before he

received the Letter in 2013--SCPD officers or detectives appeared

at his residence to verify his address.  (Pl.'s Dep. 54:19-55:10.)

He testified that after he received the Letter, in 2013 through

2016, agents of PFML or SCPD detectives--he could not distinguish

between the two--came to his home approximately a dozen times.

(Pl.'s Dep. 98:15-99:12.)   Plaintiff testified that he spoke to

SCPD detectives at his residence at least twice, encountered PFML

RVRs at his home at least once, and was "not sure" whether any

deputy sheriff went to his home to conduct a "random spot check."

(See PFML's 56.1 Stmt. ¶ 83; Pl.'s Dep. 112:4-23 (recalling visits

from SCPD detectives on January 1, 2014 and January 1, 2015); Pl.'s

Dep. 116:9-117:8 (discussing 2013 visit from PFML RVR); Pl.'s Dep.

123:12-17 ("Q[:] So altogether between 2013 through 2016, you

personally had three contacts or visits where you interacted with

either [PFML] agents or police officers and detectives?  A[:]

There could have been an additional one.  I don't recall."); Pl.'s

Dep. 124:12-17 (discussing spot checks by deputy sheriffs).)

Additionally, he testified that his wife encountered either SCPD

detectives or PFML agents at his home, (Pl.'s Dep. 90:20-92:17),

and that on one occasion, his son spoke with someone who

"identified himself as police,"[3] (Pl.'s Dep. 99:13-100:5).

_____

[3] Plaintiff testified that he believes his son encountered SCPD
Detective Dominick Arpino.  (Pl.'s Dep. 105:18-106:17 ("Q[:]
Have you had any contact with a detective Dominick Arpino?  A[:]
That name sounds familiar.  That could have been the detective
who spoke to my son, because my son said a detective gave my son
his number and said to call him back, which I did.").)

Plaintiff testified that while he and his family did not answer the door for PFML RVRs or SCPD detectives on some occasions, (Pl.'s Dep. 121:17-122:20), he was never arrested for failing to cooperate with verification attempts, (PFML's 56.1 Stmt. ¶ 88).

### 1. PFML's Attempted Verifications

On October 16, 2013, RVR Mike Waser ("RVR Waser") attempted to conduct a verification of Plaintiff's home address. (PFML's 56.1 Stmt. ¶ 74.)  When no one answered the door, he left his card.  (PFML's 56.1 Stmt. ¶ 75.)  Plaintiff testified that he did not contact PFML after receiving the card.  (Pl.'s Dep. 95:7-96:2.)  On October 17, 2013, RVR Waser returned to Plaintiff's residence and noticed that an individual was watching him from a window, but no one answered the door.  (PFML's 56.1 Stmt. ¶ 76.) He made additional unsuccessful verification attempts on October 18, 21, and 24, 2013.  (PFML's 56.1 Stmt. ¶ 77.)  On November 4, 2013, RVR Waser returned to Plaintiff's home, and an unidentified male answered the door to advise him that Plaintiff was home but refused to come downstairs.  (PFML's 56.1 Stmt. ¶ 78.) RVR Waser referred the matter to SCPD to confirm Plaintiff's address.  (PFML's 56.1 Stmt. ¶ 79.)

While PFML asserts that "the contemporaneous records maintained by PFML indicate that there was never an interaction

between [P]laintiff and PFML,"[4] (PFML's 56.1 Stmt. ¶ 90), Plaintiff testified that he answered the door for PFML on at least one occasion in 2013, (Pl.'s PFML Resp. ¶ 90; Pl.'s Dep. 116:9-117:8, 179:9-21). Plaintiff testified that during the encounter, two RVRs stood approximately three feet from his door, identified themselves as PFML agents, and compared him to a photograph they possessed. (PFML's 56.1 Stmt. ¶ 95; Pl.'s Dep. 116:22-117:8, 156:10-11.) Plaintiff testified that the RVRs were wearing nametags on chains--not police badges--and were dressed in plain clothes. (Pl.'s Dep. 116:23-117:6, 118:21-23.). According to Plaintiff, he did not say anything to the RVRs, and the RVRs did not ask for identification, ask for permission to enter his home, ask Plaintiff to leave his home, or indicate that he would be arrested if he failed to comply with the verification. (PFML's 56.1 Stmt. ¶¶ 96-99; Pl.'s Dep. 155:6-8.) Plaintiff testified that he stayed inside his house during the encounter, which lasted less than five minutes. (Pl.'s Dep. 155:18-21, 156:12-14.)

On November 10, 2014, RVR Robert Carboine ("RVR Carboine") attempted an address verification at Plaintiff's residence, but no one answered the door. (PFML's 56.1 Stmt. ¶ 80.)

---

[4] Additionally, PFML cites Detective Hernandez's testimony that "[a]s far as [he] kn[e]w," PFML could not verify Plaintiff's address, so PFML referred the case to SCPD, which opened an investigation to try to verify his address. (Hernandez Dep. 59:13-60:10.)

Thereafter, he attempted, unsuccessfully, to verify Plaintiff's address on November 11, 12, and 13, 2014; December 4 and 5, 2014; January 21, 2015; and February 21, 2015. (PFML's 56.1 Stmt. ¶ 81.) RVR Carboine referred the matter to SCPD. (PFML's 56.1 Stmt. ¶ 82.)

### 2. SCPD's Interactions with Plaintiff

Plaintiff testified that on January 1, 2014, SCPD Detective Joseph Mucha ("Detective Mucha") and another officer or detective came to Plaintiff's home to verify his address. (Pl.'s Dep. 72:7-13, 77:7-18, 87:2-5.) According to Plaintiff, Detective Mucha also told Plaintiff that he was required to sign three one-page forms (together, the "Forms"). (Pl.'s Dep. 71:22-72:25 (discussing signing the forms), 79:2-14 (testifying that Detective Mucha said that Plaintiff "had to sign [the forms]. [Plaintiff] could not refuse to sign" them).) The first form describes Plaintiff's sex offender registration requirements under New York State law, but includes additional language that (1) he "may be required to provide fingerprints or any other information necessary for compliance with the law," (2) he could be convicted of a felony if he failed to comply with legal requirements, (3) he had been advised of his sex offender reporting requirements under Chapter 745 of the Suffolk County Code, and (4) if he was homeless or receiving emergency housing assistance, he was aware of his

check-in requirements.  (Pl.'s Dep. 73:23-75:19; SORA Form, Budd

Decl. Ex. J, Docket Entry 34-11, at ECF p. 1.)

The second form describes homeless registered sex

offenders' obligations to report their overnight locations to SCPD

under the HSOA and advises that violation of the HSOA is an

unclassified misdemeanor.  (Pl.'s Dep. 80:9-16; HSOA Form, Budd

Decl. Ex. J, Docket Entry 34-11, at ECF p. 2.)  It includes an

acknowledgment providing:

> I, _____, hereby acknowledge that I received, on this date, the attached notice regarding my obligations to comply with the reporting requirements set forth in [the HSOA]; I acknowledge that I have been notified (by police or social services agency) of the reporting requirements imposed upon me by [the HSOA]; I further acknowledge I understand the reporting requirements set forth in [the HSOA] and understand that any violations, by me of [the HSOA] will subject me to punishment as outlined in this notice.

(HSOA Form.)

The third form discusses the CPA's requirement that a

"hard to place individual"--"[a]n individual registered with the

[Division] pursuant to the provisions of SORA," (Suffolk Cty. Code

§ 745-33)--who seeks emergency housing must report his or her

overnight location to SCPD and warns that violation of the CPA or

the HSOA is an unclassified misdemeanor.  (Pl.'s Dep. 81:21-82:8;

CPA Form, Budd Decl. Ex. J, Docket Entry 34-11, at ECF p. 3.)  The

third form contains an acknowledgement similar to that in the second form. (CPA Form.)

Plaintiff testified that he believed he was required to comply with the County laws indicated on the Forms, though he acknowledged that he was not homeless and that he understood the forms to apply to homeless sex offenders. (Pl.'s Dep. 82:19-83:6.)

Plaintiff testified that the entire interaction with Detective Mucha lasted fifteen to twenty minutes, though Plaintiff spent five of those minutes copying the forms.[5] (Pl.'s Dep. 78:2-23.)

Plaintiff testified that on January 1, 2015, SCPD detectives again visited him to verify his address. (Pl.'s Dep. 112:9-16.) He testified that he complied with the detectives' requests, and that the visit lasted "[a] few minutes." (Pl.'s Dep. 112:9-23.)

No PFML staff were present during these encounters with SCPD, and PFML representatives never asked Plaintiff to complete

---

[5] According to Plaintiff, during this encounter, Detective Mucha also informed him that PFML representatives are "not police, you don't have to cooperate in any way." (Pl.'s Dep. 85:4-12.) However, Plaintiff testified that both SCPD detectives and PFML RVRs drive unmarked cars and wear plain clothes, and that when he asked "[h]ow [he was] supposed to distinguish" between the two, Detective Mucha did not respond. (Pl.'s Dep. 85:4-12, 85:20-86:3.)

forms of any kind.  (PFML's 56.1 Stmt. ¶¶ 101-102; Pl.'s Dep. 112:21-23.)

II.  Procedural History

On January 5, 2016, Plaintiff commenced this action pursuant to 42 U.S.C. § 1983 ("Section 1983") in New York State Supreme Court, County of Suffolk, against the County, County Executive Steven Bellone, SCPD, outgoing Police Commissioner Edward Webber, incoming Police Commissioner Timothy Sini, Detective Dominick Arpino, Detective Joseph Mucha, John Does 1-10, the Suffolk County Department of Social Services, Commissioner John F. O'Neill, PFML, and Ahearn.  (Compl., Docket Entry 1-2.) On February 5, 2016, PFML and Ahearn removed the action to this Court.  (Notice of Removal, Docket Entry 1.)  On September 22, 2017, pursuant to the parties' stipulation, the Court dismissed the following parties as defendants in this matter: Steven Bellone, SCPD, Edward Webber, Timothy Sini, Dominick Arpino, Joseph Mucha, Suffolk County Department of Social Services, and John F. O'Neill. (Sept. 2017 Order, Docket Entry 27.)  The Court so-ordered the parties' subsequent stipulation and dismissed Ahearn as a defendant on November 9, 2017, leaving the County, PFML, and John Does 1-10 as defendants.  (Nov. 2017 Order, Docket Entry 32.)

Though the Complaint is far from clear, the Court construes it to allege that the County's and PFML's address verifications violated Plaintiff's First Amendment right to

privacy, (Compl. ¶ 48), his Fourth Amendment right to be free from unreasonable seizures, (Compl. ¶ 50), and his right to substantive due process under the Fourteenth Amendment to the U.S. Constitution and Article I, Section 11 of the New York State Constitution, (Compl. ¶¶ 52-61). Additionally, the Complaint alleges that the County violated Plaintiff's Fifth Amendment right against self-incrimination by requiring that he sign the Forms during the January 1, 2014 visit. (Compl. ¶¶ 80-81.) The Complaint also asserts a claim that the County and/or County deputy sheriffs violated Plaintiff's rights to equal protection and due process by allowing deputy sheriffs to conduct verifications. (Compl. ¶¶ 66-75.) Finally, the Complaint contains a claim for declaratory relief, requesting that the Court declare that New York State law preempts the CPA and that the CPA is unconstitutional.[6] (Compl. ¶ 64 and at 15.) Plaintiff seeks judgment against Defendants in

---

[6] The Complaint asserts this claim twice. (Compl. ¶¶ 64, 78.) Therefore, Plaintiff's seventh cause of action is DISMISSED as duplicative of his fifth cause of action. Additionally, while the Complaint contains a heading "AS AND FOR A FIRST CAUSE OF ACTION," (Compl. ¶¶ 28-46), the legal claims scattered among the factual allegations in this section are duplicative of Plaintiff's other claims. (Compare, e.g., Compl. ¶ 39 ("The purported 'acknowledgement' violates Plaintiff's Fifth Amendment rights not to incriminate himself . . . ."), with Compl. ¶ 80 ("Defendants have violated the Plaintiff's Fifth Amendment right against self-incrimination by requiring him to sign the aforesaid purported acknowledgement . . . .").) Accordingly, the Court construes the allegations in the first cause of action to be Plaintiff's recitation of the relevant facts, rather than an independent legal claim, and therefore, the first cause of action is also DISMISSED.

the amount of $1,000,000 for each cause of action; an order enjoining Defendants from performing address verifications or "spot-checks" of Plaintiff, enjoining Defendants from requiring him to sign the Forms or any acknowledgments, and declaring that the CPA is preempted by New York State law; and attorney's fees, costs, and disbursements. (Compl. at 15.) The County and PFML answered the Complaint on March 29, 2016. (Cty.'s Ans., Docket Entry 12; PFML's Ans., Docket Entry 10.)

On December 5, 2017, the County and PFML filed motions for summary judgment. (Cty.'s Br., Docket Entry 34-18; PFML's Br., Docket Entry 38.) Plaintiff opposed both motions on January 5, 2018, (Pl.'s Opp., Docket Entry 39), and Defendants filed reply briefs on January 19, 2018, (Cty.'s Reply, Docket Entry 40-1; PFML's Reply, Docket Entry 41).

DISCUSSION

I.  <u>Legal Standard</u>

Summary judgment will be granted where the movant demonstrates that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine factual issue exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed 2d 202 (1986). In determining whether an award of summary judgment is appropriate,

the Court considers the "pleadings, deposition testimony, answers to interrogatories and admissions on file, together with any other firsthand information including but not limited to affidavits." Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011).

The movant bears the burden of establishing that there are no genuine issues of material fact. Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223 (2d Cir. 1994). Once the movant makes such a showing, the non-movant must proffer specific facts demonstrating "a genuine issue for trial." Giglio v. Buonnadonna Shoprite LLC, No. 06-CV-5191, 2009 WL 3150431, at *4 (E.D.N.Y. Sept. 25, 2009) (internal quotation marks and citation omitted). Conclusory allegations or denials will not defeat summary judgment. Id. However, in reviewing the summary judgment record, "'the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'" Sheet Metal Workers' Nat'l Pension Fund v. Vadaris Tech. Inc., No. 13-CV-5286, 2015 WL 6449420, at *2 (E.D.N.Y. Oct. 23, 2015) (quoting McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997)).

## II. Defendants' Motions

The County seeks partial summary judgment dismissing all claims except for Plaintiff's Fourth Amendment claim. (Cty.'s Br. at 1.) First, the County argues that Section 1122-12 and the check-in requirements of the CPA and the HSOA never applied to or

were enforced against Plaintiff, and that as a result, he lacks standing to assert claims under those laws. (Cty.'s Br. at 6-11.) Second, the County contends that Plaintiff's privacy rights were not violated by the address verifications because PFML agents and SCPD detectives simply knocked on Plaintiff's door. (Cty.'s Br. at 11-14.) Third, the County argues that Plaintiff's due process rights under the Fourteenth Amendment were not violated because SCPD's conduct was not sufficiently outrageous or egregious. (Cty.'s Br. at 14-17.) Alternatively, it asserts that Plaintiff's Fourteenth Amendment claims should be dismissed as duplicative of his First, Fourth, and Fifth Amendment claims. (Cty.'s Br. at 17.) Fourth, the County submits that even if Plaintiff had standing to assert an equal protection claim under the Fourteenth Amendment with respect to Section 1122-12, his claim would fail because there is no evidence that County deputy sheriffs would have conducted address verifications differently from SCPD detectives. (Cty.'s Br. at 17-19.) Fifth, the County contends that even if Plaintiff had standing to bring a Fifth Amendment claim with respect to the "acknowledgement" of his check-in requirements under the HSOA and the CPA, his claim is not viable because the acknowledgment did not contain incriminating language and because he has not been charged with a crime. (Cty.'s Br. at 19-20.) Sixth, the County argues that the Court should not exercise supplemental jurisdiction over Plaintiff's state-law

preemption claim because it is a "complex, unsettled, and novel" issue. (Cty.'s Br. at 20-22.) Alternatively, the County argues that SORA does not preempt the CPA because the CPA addresses the enforcement of SORA's address verification requirements, "which is an area that SORA cannot constitutionally occupy." (Cty.'s Br. at 22-25.)

PFML moves for summary judgment dismissing all claims against it. (PFML's Br. at 1.) First, PFML maintains that it is not a state actor subject to liability under Section 1983. (PFML's Br. at 8-11.) Second, PFML contends that even if it were a state actor, its agents never seized Plaintiff because he regularly refused to submit to PFML agents' verification attempts, and during the one encounter they may have had with Plaintiff, a reasonable person would not have believed he was required to cooperate with them. (PFML's Br. at 12-20.) Third, PFML argues that even if a seizure occurred, it was reasonable in light of the minimal intrusion on Plaintiff compared to the important governmental interest in tracking and monitoring sex offenders. (PFML's Br. at 21-24.)

In his opposition--an unfocused discussion centered on Plaintiff's Fourth Amendment claims--Plaintiff maintains that PFML is a state actor that violated his Fourth Amendment rights by attempting to verify his address. (Pl.'s Opp. at 11, 15-16.) The Court liberally construes the brief as arguing that the check-in

provisions of the CPA and the HSOA injured Plaintiff. (Pl.'s Opp.
at 11-12.)  With respect to his Fifth Amendment claim, Plaintiff
contends that because the County required that he sign an
acknowledgement of the CPA's and the HSOA's check-in requirements,
he was forced to "prospectively create evidence against himself,
had he ever had the misfortune to find himself homeless," "which
is precisely the violation of the 5th Amendment."  (Pl.'s Opp. at
12.)  Plaintiff mentions Section 1122-12 only in passing and not
in relation to any claim under that law. (Pl.'s Opp. at 11.)  He
does not address the County's arguments targeting his claims under
the First and Fourteenth Amendments.  Finally, Plaintiff argues
that the Court should exercise jurisdiction over his preemption
claim and decide that SORA preempts the CPA.  (Pl.'s Opp. at 19.)

III. <u>Plaintiff's Abandoned Claims</u>

Initially, the Court concludes that Plaintiff has
abandoned the second and fourth causes of action, asserting
violations of the First and Fourteenth Amendments.  The County
unambiguously moved for summary judgment on those claims.  (<u>See,
e.g.</u>, Cty.'s Br. at 1 ("The County further asserts that . . . the
CPA, as applied to Plaintiff, has not infringed upon his First,
Fifth, and Fourteenth Amendment rights. . . .  Accordingly, the
County respectfully requests partial summary judgment in its favor
dismissing the first, second, fourth, fifth, sixth, seventh and
eighth causes of action contained within the Complaint as a matter

of law.").) In opposition, Plaintiff did not discuss the First or Fourteenth Amendments or address the County's arguments with respect to those claims, but opposed Defendants' motions with respect to his claims under the Fourth and Fifth Amendments. Therefore, Plaintiff's second and fourth causes of action are DISMISSED WITH PREJUDICE as abandoned.[7] See CIT Bank N.A. v. Elliott, No. 15-CV-4395, 2018 WL 1701947, at *10 (E.D.N.Y. Mar. 31, 2018) (citing Onewest Bank, N.A. v. Rosado, No. 14-CV-9917, 2016 WL 3198305, at *4 (S.D.N.Y. June 7, 2016)).

Additionally, the Court finds that Plaintiff abandoned his Section 1122-12 claim--the sixth cause of action in the Complaint. Again, the County clearly moved for summary judgment on the claim, (see, e.g., Cty.'s Br. at 1, 6-7), and while Plaintiff opposed the motion on other grounds, he made only passing reference to Section 1122-12, (Pl.'s Opp. at 11). Specifically,

---

[7] The substance of these causes of action survive in Plaintiff's Fourth Amendment claim, which is based on the same facts underlying the dismissed First and Fourteenth Amendment claims. (Compare Compl. ¶ 50 (Fourth Amendment) with Compl. ¶ 48 (First Amendment) and Compl. ¶¶ 52-61 (Fourteenth Amendment)); see also Strong v. Perrone, No. 17-CV-6183, 2018 WL 324421, at *5 (W.D.N.Y. Jan. 8, 2018) (alteration in original) (internal quotation marks omitted) (quoting Albright v. Oliver, 510 U.S. 266, 114 S. Ct. 807, 809, 127 L. Ed. 2d 114 (1994)) (dismissing Fourteenth Amendment substantive due process claim after analyzing Fourth Amendment claim because "'[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'").

while Plaintiff cited Section 1122-12 when discussing the Forms in the context of his Fifth Amendment claim, the Forms do not refer to Section 1122-12.  (See Pl.'s Opp. at 11; see also SORA Form; CPA Form; HSOA Form.)  Thus, Plaintiff's sixth cause of action is DISMISSED WITH PREJUDICE, and Defendants John Does 1-10, defined in the claim as "Deputy Sheriffs currently unknown," (Compl. ¶ 69), are TERMINATED.

IV.  Plaintiff's Standing to Challenge the HSOA's and the CPA's Check-In Requirements

Plaintiff challenges the check-in requirements of the HSOA and the CPA, (see Compl. ¶¶ 34-39, 80), and appears to argue that he has standing to do so because he was required to sign an acknowledgement of homeless offenders' obligations under the laws, (see Pl.'s Opp. at 11-12).  Plaintiff fails to support this argument with citations to legal authority.

Article III of the U.S. Constitution restricts the jurisdiction of federal courts to actual cases or controversies. Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547, 194 L. Ed. 2d 635 (2016) (quoting Raines v. Byrd, 521 U.S. 811, 818, 117 S. Ct. 2312, 2317, 138 L. Ed. 2d 849 (1997)).  Standing to sue, "a doctrine rooted in the traditional understanding of a case or controversy," "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong."  Id. (citing Valley Forge Christian Coll. v. Ams. United for Separation of

Church & State, Inc., 454 U.S. 464, 473, 102 S. Ct. 752, 759, 70 L. Ed. 2d 700 (1982); Warth v. Seldin, 422 U.S. 490, 498-99, 95 S. Ct. 2197, 2205, 45 L. Ed. 2d 343 (1975)).

To establish standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Id. An injury in fact must be "'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Id. at 1548 (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560, 112 S. Ct. 2130, 2136, 119 L. Ed. 2d 351 (1992)).

While "[p]reenforcement challenges to criminal statutes . . . are cognizable under Article III," a plaintiff seeking to challenge the statute must have "'alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there [must] exist[ ] a credible threat of prosecution thereunder.'" Cayuga Nation v. Tanner, 824 F.3d 321, 331 (2d Cir. 2016) (quoting Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298, 99 S. Ct. 2301, 2309, 60 L. Ed. 2d 895 (1979)). That is, a plaintiff has standing to challenge a statute before it is enforced against him "'when fear of criminal prosecution under an allegedly unconstitutional statute is not imaginary or wholly speculative.'" Id. (quoting Hedges v. Obama, 724 F.3d 170, 196 (2d Cir. 2013)).

For purposes of this Memorandum and Order, the Court will assume that Plaintiff intends "'to engage in a course of conduct arguably affected with a constitutional interest.'"  Id. (quoting Babbitt, 442 U.S. at 298, 99 S. Ct. at 2309). Nonetheless, Plaintiffs claimed fear of prosecution under the check-in requirements of the HSOA or the CPA is entirely speculative, does not constitute an injury in fact, and does not support his standing.  By their terms, the laws apply to homeless sex offenders, Suffolk County Code § 745-24, and sex offenders "seeking emergency housing assistance," Suffolk County Code § 745-35.  Since Plaintiff's registration period began in 1999, he was never homeless, he never contacted SCPD to report his overnight placement or location, and he was never found in violation of these laws.  (Cty.'s 56.1 Stmt. ¶¶ 31-32; Pl.'s Cty. Resp. ¶ 33; Pl.'s Dep. 76:14-18; see also Pl.'s Dep. 75:10-76:10 (testifying that when he signed the Forms, he did not believe he was "in the category of registrants who were subject to" the check-in requirements of the HSOA or the CPA); Pl.'s Dep. 9:20-10:2 (testifying that Plaintiff has owned his home since 1990 or 1991).)  Additionally, Plaintiff does not proffer evidence, let alone allege, that he may become homeless or seek emergency shelter in the future.  Thus, regardless of the Forms or his acknowledgments of the laws, he was never required to comply with the HSOA's or the CPA's check-in requirements, and there is no evidence suggesting that he may have

to do so going forward.  Cf. Cayuga Nation, 824 F.3d at 331-32 (finding that three plaintiffs had preenforcement standing where they "have alleged that they intend to conduct bingo games, which is clearly prohibited by the Ordinance, and the Village has announced its intention to enforce the Ordinance against the Nation and" that group of plaintiffs).  Accordingly, Plaintiff's claims related to the check-in requirements of the HSOA or the CPA are DISMISSED WITHOUT PREJUDICE.  See Santana v. Take-Two Interactive Software, Inc., 717 F. App'x 12, 17 (2d Cir. 2017) (citing Katz v. Donna Karan Co., 872 F.3d 114, 121 (2d Cir. 2017) ("A complaint dismissed for lack of Article III standing should be without prejudice because the court is without subject matter jurisdiction.").

V.   Plaintiff's Fifth Amendment Claim

Plaintiff argues that his Fifth Amendment rights were violated when SCPD forced him to sign the Forms and acknowledgments of the HSOA's and the CPA's check-in requirements because doing so required him "to prospectively create evidence against himself, had he ever had the misfortune to find himself homeless; the signed notices, to be sure, would have been the People's 'Exhibit 1' in any such failure to report prosecution."  (Pl.'s Opp. at 11-13.) Plaintiff cites no legal authority in support of his position.

"The Fifth Amendment, made applicable to the States by the Fourteenth Amendment, requires that '[n]o person . . . shall

27

be compelled _in any criminal case_ to be a _witness_ against himself.'" _Chavez v. Martinez_, 538 U.S. 760, 766, 123 S. Ct. 1994, 2000, 155 L. Ed. 2d 984 (2003) (plurality opinion) (alteration, ellipsis, and emphasis in original) (quoting U.S. CONST. amend. V) (internal citation omitted). "[A] 'criminal case' at the very least requires the initiation of legal proceedings." _Id._ (citations omitted).

This claim also fails. There is no evidence that Plaintiff was subject to a criminal proceeding arising out of the CPA or the HSOA. Therefore, he was never "made to be a 'witness' against himself in violation of the Fifth Amendment's Self-Incrimination Clause because his statements were never admitted as testimony against him in a criminal case." _See_ _id._ at 767, 123 S. Ct. at 2001; _see also_ _Williams v. Dubray_, 557 F. App'x 84, 87 (2d Cir. 2014) (emphasis in original) (quoting _Chavez_, 538 U.S. at 770, 123 S. Ct. at 1994) (citing _Wolff v. McDonnell_, 418 U.S. 539, 556, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974)) (affirming dismissal of self-incrimination claim related to plaintiff's testimony at prison disciplinary proceeding and noting that "[w]hile an individual may assert his self-incrimination privilege in any proceeding, 'a violation of the constitutional _right_ against self-incrimination occurs only if one has been compelled to be a witness against himself in a criminal case.'"). Therefore, Plaintiff's

Fifth Amendment claim--the eighth cause of action in the Complaint--is DISMISSED WITH PREJUDICE.

## VI.  Plaintiff's Fourth Amendment Claims Against PFML

The Court construes the Complaint as alleging, and Plaintiff's brief as arguing,[8] that PFML representatives violated his Fourth Amendment rights when they conducted an in-person visual verification at his home in 2013.[9]  (See Compl. ¶ 50; see, e.g., Pl.'s Opp. at 2, 9, 16.)

### A.  The Jones Matter

In their briefing, the parties discuss this Court's Order granting in part and denying in part the County's and PFML's motions to dismiss in the Jones matter, which was previously pending before the undersigned.  (See, e.g., Pl.'s Opp. at 9-11, 13-16; PFML's Reply at 2, 4-5); see also Jones v. Cty. of Suffolk

---

[8] Parsing Plaintiff's arguments is difficult, as his briefing consists largely of lengthy and convoluted recitations of the facts.  (See, e.g., Pl.'s Opp. at 3-4 ("This insidious, comply-or-else be clasped in handcuffs by the iron-hand-inside-the-velvet-glove approach was firmed up further when jointly, Defendants sent out a letter in July 2013, on Suffolk County letterhead, from Det. Stephen Hernandez (unsigned) to announce that PFML would be making visits to 'all registrants within the Suffolk County Police District to conduct in person residence verifications.'").)

[9] While Plaintiff is unsure whether this interaction was with PFML RVRs or SCPD detectives, (see PFML's 56.1 Stmt. ¶ 89), the Court must view the facts in the light most favorable to Plaintiff.  Therefore, in the context of PFML's motion, the Court assumes that the interaction was between Plaintiff and RVRs.

("Jones I"), 164 F. Supp. 3d 388 (E.D.N.Y. 2016). Additionally, in this action, PFML relies on evidence from and arguments asserted in its summary judgment motion from the Jones matter. (See PFML's Br. at 8-11; see, e.g., PFML's 56.1 Stmt. ¶¶ 33-38 (citing depositions from the Jones matter).)

In the Jones action, the plaintiff, proceeding under the pseudonym John Jones, was a Level One Offender. Jones I, 164 F. Supp. 3d at 392. As relevant here, Jones sued the County and PFML arguing that they violated his Fourth Amendment rights when PFML conducted two address verifications at his home pursuant to the CPA. Id. at 391, 393-94. On February 16, 2016, this Court denied Defendants' motion to dismiss with respect to Jones' Fourth Amendment claim, finding that Jones had sufficiently alleged that PFML was a state actor that could be held liable under Section 1983 and that he stated a claim for violation of his Fourth Amendment rights. Id. at 394-98. On August 24, 2017, Defendants moved for summary judgment. Jones II, 2018 WL 2023477, at *8.

On May 1, 2018, after the parties briefed the motions in this matter, this Court issued its Memorandum and Order concerning the Jones summary judgment motions. Id. at *1. The Court dismissed Jones' Fourth Amendment claim, finding that while PFML was a state actor, id. at *9-12, and there was an issue of fact with respect to whether Jones was seized, id. at *12-15, any seizure was reasonable and did not violate Jones' Fourth Amendment

rights, id. at *15-20.  Jones filed a notice of appeal on May 25, 2018, and the appeal is pending before the Second Circuit.

B.    Whether PFML Is a State Actor

Initially, PFML--relying mostly on depositions from and arguments raised in the Jones matter--argues that it is not a state actor subject to liability under Section 1983.  (PFML's Br. at 8-11.)  Plaintiff contends that PFML is a state actor.  (Pl.'s Opp. at 9-11.)  As discussed above, in this Court's summary judgment Memorandum and Order in Jones, the undersigned concluded that PFML was a state actor for purposes of carrying out address verifications under the CPA.  Jones II, 2018 WL 2023477, at *9-13.  For the reasons set forth in Jones II, the Court finds PFML to be a state actor for purposes of this matter, and thus, proceeds to consider PFML's arguments regarding whether it violated Plaintiff's Fourth Amendment rights.

C.    Whether Plaintiff's Fourth Amendment Rights Were Violated

The Fourth Amendment protects an individual's right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST. amend. IV. However, "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred," which implicates a citizen's Fourth Amendment rights.  Terry v. Ohio,

31

392 U.S. 1, 19 n.16, 88 S. Ct. 1868, 1879, 20 L. Ed. 2d 889 (1968).

To determine whether the Fourth Amendment has been violated, the Court "must engage in a two-part analysis: (1) considering all of the circumstances of the case, was there a seizure within the meaning of the Fourth Amendment; and (2) if there was a seizure, was such seizure reasonable." Jie Yin v. NFTA, 188 F. Supp. 3d 259, 270 (W.D.N.Y. 2016) (internal quotation marks and citation omitted).

A seizure takes place when a reasonable person would not "feel free to decline the [police] officers' requests or otherwise terminate the encounter." Florida v. Bostick, 501 U.S. 429, 436, 111 S. Ct. 2382, 2387, 115 L. Ed. 2d 389 (1991); see also United States v. Serrano, 695 F. App'x 20, 22 (2d Cir. 2017). In other words, "in order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." Bostick, 501 U.S. at 439, 111 S. Ct. at 2389, 115 L. Ed. 2d 389; see also United States v. Lee, 916 F.2d 814, 819 (2d Cir. 1990) ("Essentially, this inquiry is an objective assessment of the overall coercive effect of the police conduct.").

The following factors suggest a seizure has occurred: "the threatening presence of several officers; the display of a

weapon; physical touching of the person by the officer; language or tone indicating that compliance with the officer was compulsory; prolonged retention of a person's personal effects . . . ; and a request by the officer to accompany him to the police station or a police room." Lee, 916 F.2d at 819; see also United States v. Mendenhall, 446 U.S. 544, 554, 100 S. Ct. 1870, 1877, 64 L. Ed. 2d 497 (1980). For example, in United States v. Drayton, the Supreme Court found that police officers who boarded a Greyhound bus and asked passengers questions about their travel plans and luggage did not "seize" the passengers because "there was nothing coercive [or] confrontational about the encounter." 536 U.S. 194, 203-04, 122 S. Ct. 2105, 2112, 153 L. Ed. 2d 242 (2002) (internal quotation marks and citation omitted; alteration in original). However, the Supreme Court concluded that while police officers may ask questions and request identification "even when [they] have no basis for suspecting a particular individual," officers may "not induce cooperation by coercive means." Id. at 201, 122 S. Ct. at 2110, 153 L. Ed. 2d 242.

In Jones II, this Court found "that there is a genuine issue of fact as to whether a reasonable person in [the p]laintiff's position would have felt free to terminate the address verifications" where (1) the encounters with PFML RVRs took place within the curtilage of the plaintiff's home; (2) the plaintiff had received the Letter, which was ambiguous as to whether

compliance with PFML was required; (3) the plaintiff's wife testified that she had called SCPD to ask if her husband was required to comply with PFML, and SCPD told her that he "should answer the questions, [and] not to be rude to the people from Megan's Law"; and (4) there was testimony that during one verification, RVRs waited fifteen minutes--until the plaintiff finished showering--to speak to him. Jones II, 2018 WL 2023477, at *14 (second alteration in original). Additionally, according to the plaintiff, PFML RVRs asked him a series of questions, requested that he produce identification, followed him closely as he walked to retrieve his driver's license from his truck, which was parked thirty to forty feet away from his front door, and suggested that they would visit him at his job. Id. at *7-8.

Here, the Court concludes that PFML did not seize Plaintiff within the meaning of the Fourth Amendment. While the Court is cognizant that like in Jones, Plaintiff's interaction with PFML occurred within the curtilage of his home, (Pl.'s Dep. 117:17-19 (testifying that PFML RVRs were on his stoop)); see Florida v. Jardines, 569 U.S. 1, 6-7, 133 S. Ct. 1409, 1414-15, 185 L. Ed. 2d 495 (2013) (explaining that the front porch is part of a home's curtilage), and that he testified that he received the Letter, which arguably suggested that compliance with PFML was mandatory, prior to the encounter, (Pl.'s Dep. 163:6-9); see Jones I, 164 F. Supp. 3d at 398, the similarities to Jones end there.

According to Plaintiff, on the one occasion he could remember answering the door for PFML RVRs,[10] they compared him to a photograph while he stood inside his house, and then they left. The RVRs made no demands of Plaintiff:  He testified that he did not say anything to them and he did not "think they said much of anything other than to take the picture and look at" him.  (Pl.'s Dep. 117:11-16.)  They did not touch him, threaten him with arrest, ask him for identification, ask to enter his home, or ask him to leave his house.  (PFML's 56.1 Stmt. ¶¶ 96-98; Pl.'s Dep. 153:18-23, 155:6-8.)  Plaintiff did not believe that they were carrying guns, was not able to see if they had any other type of weapon, and was not aware of whether they had handcuffs.  (Pl.'s Dep. 156:21-157:3.)  Unlike <u>Jones</u>, neither Plaintiff nor his wife were told by SCPD that he should answer the RVRs' questions, and unlike <u>Jones</u>, there is no evidence that RVRs waited for Plaintiff on his porch for fifteen minutes after learning that he was temporarily unavailable.  In fact, on a prior occasion, someone in Plaintiff's house told an RVR that Plaintiff <u>refused</u> to come to the door, (PFML's 56.1 Stmt. ¶ 78), and Plaintiff testified that on multiple

---

[10] To the extent Plaintiff argues he was seized during PFML's unsuccessful verification attempts, (<u>see, e.g.</u>, Pl.'s Opp. at 16), his argument fails.  By not answering the door for PFML RVRs, he did not submit to any assertion of authority.  <u>See United States v. Huertas</u>, 864 F.3d 214, 216 (2d Cir. 2017) (holding that the defendant "never 'submitted' to [the police officer] and was therefore never 'seized' within the meaning of the Fourth Amendment").

occasions, he and his family did not answer the door for PFML RVRs or SCPD detectives, (Pl.'s Dep. 121:17-122:20).  Regardless, Plaintiff was never arrested for failing to cooperate with the attempted verifications.  (PFML's 56.1 Stmt. ¶ 88.)  Considering all the circumstances, the RVRs' conduct would not have conveyed to a reasonable person in Plaintiff's position that he was required to comply with the RVRs or that he was not free to end the encounter.

Though unclear from his briefing, Plaintiff appears to argue that PFML RVRs' interactions with his wife and son increased the coercive effect of their conduct,[11] as did their referral of future address verifications to SCPD.  (Pl.'s Opp. at 16.)  The Court is unpersuaded.  <u>First</u>, the evidence shows that an SCPD detective and not an RVR spoke with his son, and therefore, this interaction is irrelevant to PFML's motion.  (Pl.'s Dep. 99:13-100:5, 105:18-106:12.)  <u>Second</u>, even assuming that Plaintiff's wife encountered PFML RVRs and not SCPD detectives--Plaintiff was unsure whether his wife spoke with SCPD or PFML, (Pl.'s Dep. 91:13-16)--Plaintiff did not testify that they suggested to her that his

---

[11] Any claim that PFML RVRs violated Plaintiff's Fourth Amendment rights during the alleged encounters with his son and wife fails because "'Fourth Amendment rights are personal, and may be enforced only by persons whose own protection under the Amendment has been violated.'"  <u>Davis-Payne v. Galie</u>, No. 09-CV-6363, 2015 WL 7573241, at *2 (W.D.N.Y. Nov. 25, 2015) (quoting <u>United States v. Fields</u>, 113 F.3d 313, 320 (2d Cir. 1997)).

compliance with verifications was mandatory.  In fact, Plaintiff
confirmed that he did not "recall her having any conversations
with [him] about it other than her saying that someone was at the
house."  (Pl.'s Dep. 92:14-17.)  Therefore, her contact would not
have increased the coercive effect of PFML's interaction with
Plaintiff.  <u>Third</u>, as to the referrals, Plaintiff cites no evidence
showing that at the time of PFML's visual inspection, he was aware
that they had referred him to SCPD for further investigation, and
thus, the referrals could not have influenced how a reasonable
person would have viewed the encounter.[12]

---

[12] Additionally, the Court concludes that even if PFML RVRs'
brief encounter with Plaintiff was a seizure, it was reasonable.
In <u>Jones II</u>, this Court analyzed the CPA's address-verification
program and concluded that it "served a special need because the
primary purpose of the program was to verify the addresses of
registered sex offenders in order to improve the accuracy of the
sex offender registry."  <u>Jones II</u>, 2018 WL 2023477, at *15-18.
It then "balance[d] this special need against [the p]laintiff's
privacy interest utilizing the" following three factors:
"'(1) the nature of the privacy interest involved; (2) the
character and degree of the government intrusion; and (3) the
nature and immediacy of the government's needs, and the efficacy
of its policy in addressing those needs.'"  <u>Id.</u> at *19 (quoting
<u>United States v. Amerson</u>, 483 F.3d 73, 83-84 (2d Cir. 2007)).
The Court found that "if Plaintiff was seized, the seizure was
reasonable and did not violate the Fourth Amendment.  While
Plaintiff's privacy interest weighs in his favor, the nature of
the intrusion and the County's compelling interests tip the
balance in Defendants' favor."  <u>Id.</u> at *20.  For the reasons
fully elaborated in <u>Jones II</u>, <u>id.</u> at *19-20, the Court concludes
after balancing these factors that Plaintiff's privacy interests
are outweighed by the compelling interests advanced by the CPA's
address-verification program.  Thus, even if PFML seized
Plaintiff, the seizure did not violate his Fourth Amendment
rights.

In light of the foregoing, Plaintiff's third cause of action for the violation of his Fourth Amendment rights by PFML is DISMISSED WITH PREJUDICE.[13]

VII. <u>Plaintiff's Claim that SORA Preempts the CPA</u>

As discussed, Plaintiff seeks a judgment declaring that the CPA is preempted by SORA, as well as related injunctive relief. (Compl. ¶ 64 and at 15.) The County's primary argument with respect to this claim is that the Court should leave the preemption issue to the state courts.[14] (Cty.'s Br. at 20-22.) In opposition, Plaintiff contends that the Court should decide whether SORA preempts the CPA. (Pl.'s Opp. at 19.) With respect to the substance of the claim, Plaintiff's argument reads:

> The County's argument as to why SORA is not pre-emptive of the CPA is similarly misplaced; the very premise of the Plaintiff's case (as in <u>Jones</u>) is that <u>SORA</u> provides, exclusively, the statutory authority for regulating sex offender registration, verification, and notification requirements. Any additional, more stringent, coercive local statutory amplifications of SORA are unlawful and must be determined to be so, for the aforesaid reasons.

(Pl.'s Opp. at 19 (emphasis in original).)

---

[13] The County did not move for summary judgment with respect to this claim, and therefore, it survives against the County.

[14] The County also argues that if the Court exercises jurisdiction over the preemption issue, the Court should find that SORA does not preempt the CPA. (Cty.'s Br. at 22-25.)

A court may exercise pendent jurisdiction over a state law claim where the state and federal claims "derive from a common nucleus of operative fact." United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725, 86 S. Ct. 1130, 1138, 16 L. Ed. 2d 218 (1966). Here, Plaintiff's remaining claim for violation of his Fourth Amendment rights by the County, (see Compl. at 15), arises out of the same set of facts as the preemption claim. Additionally, despite the County's argument, the Court does not view this issue as unduly complex, unsettled, or novel. Accordingly, in its discretion, the Court is prepared to address whether the portions of the CPA regarding address verifications and PFML are preempted by SORA.

However, the County's primary argument on preemption concerns whether the Court should decide the issue in the first place. (Cty.'s Br. at 20-22.) Moreover, Plaintiff's opposition to the County's preemption argument consists of two sentences that lack substantive legal analysis and citations to authority. (Pl.'s Opp. at 19.) Further, to the extent Plaintiff seeks declaratory and injunctive relief, he must move for it. See Nat'l Fuel Gas Supply Corp. v. Town of Wales, No. 12-CV-0034, 2013 WL 5739033, at *3 (W.D.N.Y. Oct. 22, 2013) (quoting Allstate Ins. Co. v. Martinez, No. 11-CV-0574, 2012 WL 1379666, at *4 (D. Conn. Apr.20, 2012) (noting that a motion for declaratory judgment "'may be properly asserted by the parties in a motion for summary judgment'").

In light of the foregoing, the County's motion for summary judgment with respect to the preemption claim is DENIED WITHOUT PREJUDICE. To the extent Plaintiff seeks a declaratory judgment and related injunctive relief, he is directed to file a motion for summary judgment seeking that relief within fourteen (14) days of the date of this Memorandum and Order. The County's opposition and/or cross-motion for summary judgment shall be filed fourteen (14) days thereafter; Plaintiff's reply, if any, shall be filed within seven (7) days of the County's cross-motion and/or opposition; and the County's reply, if any, shall be filed within the following seven (7) days.

However, if Plaintiff does not wish to proceed with his claim for a declaratory judgment and related injunctive relief, he shall file a stipulation of discontinuance with respect to that claim within fourteen (14) days of the date of this Memorandum and Order, and this matter shall then proceed expeditiously to trial.

<u>CONCLUSION</u>

For the foregoing reasons, PFML's motion (Docket Entry 35) is GRANTED and Plaintiff's claims against PFML are DISMISSED WITH PREJUDICE.

The County's motion (Docket Entry 34) is GRANTED IN PART and DENIED IN PART. Specifically, the County's Motion is GRANTED with respect to Plaintiff's first, second, fourth, sixth, seventh,

and eighth causes of action.[15]  Those claims are DISMISSED WITH

PREJUDICE, except that the portions of any claim challenging the

check-in requirements of the HSOA and the CPA are DISMISSED WITHOUT

PREJUDICE for lack of standing.  The County's motion is DENIED

WITHOUT PREJUDICE with respect to Plaintiff's fifth cause of

action.  If Plaintiff seeks to obtain a declaratory judgment and

related injunctive relief with respect to that claim, he is

directed to file a motion for summary judgment within fourteen

(14) days of the date of this Memorandum and Order.  The County's

opposition and/or cross-motion for summary judgment shall be filed

fourteen (14) days thereafter; Plaintiff's reply, if any, shall be

filed within seven (7) days of the County's cross-motion and/or

opposition; and the County's reply, if any, shall be filed within

the following seven (7) days.  If Plaintiff does not wish to

proceed with this claim, he shall file a stipulation of

discontinuance within fourteen (14) days of the date of this

Memorandum and Order, and this case will then proceed to trial on

Plaintiff's remaining claim, the third cause of action against the

County for the alleged violation of his Fourth Amendment rights.

---

[15] As discussed above, the Court construes Plaintiff's first
cause of action as the factual basis for his Complaint, rather
than an independent legal claim, and his seventh cause of action
is duplicative of his fifth cause of action.

The Clerk of the Court is directed to TERMINATE "Parents for Megan's Law and The Crime Victims Center" and "John Does 1-10" as Defendants in this matter.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:      September __19__, 2018
            Central Islip, New York